## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CR-22-00218-PRW-2 |
| | ) | |
| STOLYNN SHANE STAMBAUGH, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Before the Court is Defendant Stolynn Shane Stambaugh's Motion to Dismiss Count 3 of the Indictment as Unconstitutional (Dkt. 31) and the United States' Response in Opposition (Dkt. 38). Stambaugh seeks to dismiss Count 3—Receipt of a Firearm by a Person Under Indictment, in violation of 18 U.S.C. § 922(n)—on grounds that § 922(n), as applied to him, violates the Second Amendment to the United States Constitution. The motion has been briefed and heard.  For the reasons explained below, the Court **GRANTS** Stambaugh's motion (Dkt. 31).

### *Background*

On June 17, 2021, the State of Oklahoma charged Stambaugh with felony larceny, alleging that he stole tools out of the back of a pickup truck. Stambaugh was released on bond while awaiting trial on that charge.

While out on bond, Stambaugh and another man allegedly stole a pistol from a gun store. Because he had stolen the pistol from the holder of a federal license to sell firearms, the United States charged Stambaugh with stealing the gun from a federal licensee. The

1

United States also charged Stambaugh with violating 18 U.S.C. § 922(n), which provides that "[i]t shall be unlawful for any person who is under indictment for a crime punishable by imprisonment for a term exceeding one year to . . . receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."

The United States argued that Stambaugh should be detained pending his trial on these federal charges, but a magistrate judge disagreed, concluding that the United States had failed to establish that, among other things, "the nature and seriousness of the danger to any person or the community that would be posed by [Stambaugh's] release" warranted detention.[1] Stambaugh was thus released on bond.

Stambaugh argues that § 922(n) is unconstitutional as applied to him, relying on *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*.[2] In Stambaugh's view, the mere fact that he has been indicted for a non-violent felony cannot deprive him of his Second Amendment right to receive a firearm. But in the United States' view, those indicted for felonies are categorically "non-law-abiding and dangerous" persons who can not only be stripped of their Second Amendment right to receive a firearm, but also criminally prosecuted and imprisoned for such receipt.

### *Legal Standard*

---

[1] 18 U.S.C. § 3142(g)(4) ("The judicial officer shall, in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, take into account . . . the nature and seriousness of the danger to any person or the community that would be posed by the person's release.").

[2] 142 S. Ct. 2111 (2022).

The Second Amendment to the United States Constitution protects "the right of the people to keep and bear Arms."[3] Recognizing  that the "central component" of this right is individual self-defense,[4] the Supreme Court has held that the Second Amendment protects "the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense,"[5] as well as the right to carry a handgun for self-defense outside the home.[6]

When the government seeks to enforce a law that burdens the exercise of this right, the Supreme Court says that challenges to such laws should be analyzed as follows:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."[7]

This framework thus requires courts to "assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding" by analogical reasoning.[8] "[A]nalogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be

---

[3] U.S. Const. amend. II.

[4] *D.C. v. Heller*, 554 U.S. 570, 599 (2008).

[5] *Bruen*, 142 S. Ct. at 2122.

[6] *Id.*

[7] *Id.* at 2129–30.

[8] *Id.* at 2131.

analogous enough to pass constitutional muster."[9] A "central consideration" is "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified."[10] And since "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*," the government must identify a historical analogue in existence near the time the Second Amendment was adopted in 1791.[11]

## *Discussion*

Applying *Bruen*'s framework to this case, the Court will consider whether the Second Amendment's plain text covers Stambaugh's conduct and whether, as applied to Stambaugh, § 922(n) is consistent with the Nation's historical tradition of firearm regulation.

### *A. The Second Amendment's Plain Text*

The Second Amendment protects the right of "the people" to keep and bear arms. The Unites States argues that a person under indictment for a felony, like Stambaugh, "is exactly the kind of non-law-abiding, dangerous person that can be disarmed consistent with the Second Amendment."[12] Since persons under indictment for a felony have been

---

[9] *Id.* at 2133.

[10] *Id.* (internal quotations and citations omitted).

[11] *Id.* at 2136 (quoting *Heller*, 554 U.S. at 634–35).

[12] Gov.'t's Resp. (Dkt. 38), at 4.

"accused of a crime" by a grand jury, which the United States says "provides some due process,"[13] such persons are not law-abiding citizens and are thus not part of "the people."

The problem with this argument, however, is that neither *Bruen* nor *Heller* go this far. To be sure, *Bruen* called the petitioners "two ordinary, law-abiding, adult citizens," and in *Heller* the Court recognized that nothing in the opinion "should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill," but neither decision explicitly nor implicitly removes those merely *accused* of a felony by a grand jury from "the people" entitled to the protection of the Second Amendment. Indeed, when the bedrock principle of our system of criminal justice is that those accused of crimes are innocent until proven guilty, it should go without saying that a person indicted for a felony is not a felon. And categorically deeming those indicted for felonies "non-law-abiding and dangerous"—as the United States urges—is at odds not only with the presumption of innocence, but also with our system of pre-trial detention, where judges are tasked with making individualized determinations of dangerousness. Therefore, as a person who is presumed to be a law-abiding citizen until proven otherwise at trial, Stambaugh remains part of "the people" whom the Second Amendment protects.

Having concluded that Stambaugh is part of "the people," and because the United States does not dispute that the handgun at issue is a weapon in "common use" today for self-defense, the Court turns to whether "the Second Amendment's plain text covers [his]

---

[13] *Id.*

5

conduct."[14] The Second Amendment protects the people's right "to keep and bear arms." The United States does not dispute that the Second Amendment's plain text covers receiving a firearm—receipt is the condition precedent to keeping and bearing arms. Therefore, the Second Amendment's plain text covers Stambaugh's receipt of a firearm, and "the Constitution presumptively protects such conduct."[15] The burden now falls on the United States to show that applying § 922(n) to Stambaugh's receipt of a firearm "is consistent with this Nation's historical tradition of firearm regulation."

*B.   Section 922(n) and the Nation's Historical Tradition of Firearm Regulation*

        *Bruen* explained that "[t]he job of judges is not to resolve historical questions in the abstract; it is to resolve *legal* questions presented in particular cases or controversies."[16] This legal inquiry is guided by "evidentiary principles and default rules," including the principle of party presentation.[17] The Court will accordingly decide this legal question based on the arguments and historical record the parties have compiled in their respective briefs and during oral argument.[18]

---

[14] *Bruen*, 142 S. Ct. at 2129.

[15] *See United States v. Quiroz*, No. PE:22-CR-00104-DC, 2022 WL 4352482, at *4 (W.D. Tex. Sept. 19, 2022).

[16] *Bruen*, 142 S. Ct. at 2130 n.6.

[17] *Id.*

[18] *Id.* ("[I]n our adversarial system of adjudication, we follow the principle of party presentation. Courts are thus entitled to decide a case based on the historical record compiled by the parties.") (internal quotations and citations omitted).

In its brief and during the hearing on Stambaugh's motion to dismiss Count 3 of the Indictment, the United States relied solely on surety statutes from the mid-nineteenth century to show a historical tradition of prohibiting receipt of a firearm by persons under indictment. *Bruen* recognized that "in the mid-19th century, many jurisdictions began adopting surety statutes that required certain individuals to post bond before carrying weapons in public."[19] These surety statutes "required any person who was reasonably likely to 'breach the peace,' and who, standing accused, could not prove a special need for self-defense, to post a bond before publicly carrying a firearm."[20] The United States argues that these historical statutes are sufficiently analogous to today's § 922(n). For the reasons that follow, however, the Court is unpersuaded that surety statutes provide a historical analogue.

First is the issue of timing. "Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*,"[21] so "the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791."[22] That is why, as the Court noted in *Bruen*, "not all history is created equal."[23] The Court thus instructed that history long

---

[19] *Id.* at 2148.

[20] *Id.*

[21] *Id.* at 2136 (quoting *Heller*, 554 U.S. at 634–35).

[22] *Id.* at 2137.

[23] *Id.*

after 1791 should not be given undue weight when interpreting the scope of the Second

Amendment.[24]

Massachusetts enacted the first surety statute in 1836,[25] nearly half a century after

the Second Amendment was adopted in 1791.[26] That statute provided that

> [i]f any person shall go armed with a dirk, dagger, sword, pistol, or other
> offensive and dangerous weapon, without reasonable cause to fear an assault
> or other injury, or violence to his person, or to his family or property, he may,
> on complaint of any person having reasonable cause to fear an injury, or
> breach of the peace, be required to find sureties for keeping the peace, for a

---

[24] "[T]o the extent later history contradicts what the text says, the text controls. . . . Thus, 'post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id.* at 2137 (citing *Heller*, 670 F.3d at 1274 n.6).

[25] At the hearing, the United States also pointed to a 1759 New Hampshire law that it claimed was a surety statute. This New Hampshire law, however, operated differently than laws such as the surety statute in Massachusetts. The 1759 law permitted justices of the peace to arrest "all affrayers, rioters, disturbers or breakers of the peace, or any other who shall go armed offensively." Laws of His Majesty's Province of *New*-Hampshire in New England 1 (1759). Then, after a person was arrested for this crime, that person could be released from prison after posting a surety, and the "arms or weapons *so used* by the offender, to be taken away, which shall be forfeited and sold for his Majesty's use." *Id.* at 2 (emphasis added). This backward-looking law, which punished persons who had already gone "armed offensively" and allowed for forfeiture of the weapon *used in that crime*, is distinct from forward-looking surety statutes that were based on a "reasonable cause to fear an injury, or breach of the peace" and allowed persons to post a bond and continue carrying a firearm. As the Supreme Court noted in *Bruen*, the New Hampshire law "merely codified the existing common-law offense of bearing arms to terrorize the people." *Bruen*, 142 S. Ct. at 2143. Therefore, the New Hampshire law isn't analogous to the Massachusetts surety statute enacted in 1836, much less a historical analogue to § 922(n).

[26] *Id.* at 2148. It should be noted that in *Bruen*, the relevant law was a New York statute. The Second Amendment is applicable to the states through the Fourteenth Amendment, which was ratified in 1868. *Id.* at 2138. The Court explained that "the public understanding of the right to keep in bear arms in 1791 and 1868 was, for all relevant purposes, the same with respect to public carry." *Id.* Therefore, the Court did not address "an ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its right." *Id.*

term not exceeding six months, with the right of appealing as before
provided.[27]

The Court in *Bruen* added that "[b]etween 1838 and 1871, nine other jurisdictions adopted variants of the Massachusetts law."[28] The United States thus rests its argument on laws enacted between forty-five and eighty years after the Second Amendment was adopted. But the Court considers this history too far removed from 1791 such that "they do not provide as much insight into [the Second Amendment's] original meaning as earlier sources."[29]  Furthermore, a full eighty years after 1791, only ten of the Nation's thirty-seven states[30] had adopted surety statutes.[31]

Timing and lack of widespread adoption aside, surety statutes are not analogous to § 922(n). First, unlike § 922(n), which regulates a person's right to *receive* a firearm, the surety statutes regulated a person's right to *carry* a firearm in public. And while the surety statutes placed a *condition* on the right to carry a firearm—a condition satisfied by posting a bond—§ 922(n) operates as a complete *deprivation* of a person's right to receive a firearm by criminalizing and punishing that conduct.

---

[27] Mass. Rev. Stat., ch. 134, § 16.

[28] *Bruen*, 142 S. Ct. at 2148.

[29] *Id.* at 2137.

[30] *See* Samuel Shipley, *List of U.S. States' Dates of Admission to the Union*, Encyclopedia Britannica (Feb. 11, 2020), https://www.britannica.com/topic/list-of-U-S-states-by-date-of-admission-to-the-Union-2130026.

[31] *Cf. Bruen*, 142 S. Ct. at 2138 ("But apart from a handful of late-19th-century jurisdictions, the historical record compiled by respondents does not demonstrate a tradition of broadly prohibiting the public carry of commonly used firearms for self-defense.").

Furthermore, § 922(n) is more restrictive than surety statutes with respect to "the *central component* of the Second Amendment right": individual self-defense.[32] The surety statutes did not restrict a person from possessing or receiving a firearm, nor did they prohibit a person from carrying a firearm in public for self-defense—again, a person accused under a surety law could post a bond and continue to carry their firearm in public. And the Massachusetts surety law even provided an exception for persons who had "a reasonable cause to fear an assault or other injury."[33] In contrast, § 922(n) provides no self-defense exception, and assuming a person had no firearm at the time of the underlying indictment, that person could not even acquire a firearm for self-defense in the home. Surety laws and § 922(n) thus impose qualitatively different burdens on the "central component" of the Second Amendment right.[34]

Lastly, surety laws and § 922(n) differ in the process provided prior to the burdening of Second Amendment rights. Surety laws required a specific, individualized finding by a neutral magistrate of "reasonable cause to fear an injury, or breach of the peace."[35] This required a showing of reasonable cause to fear that a person would cause an injury or breach of the peace *with a firearm.*[36] Section 922(n), however, requires no such individualized

---

[32] *Id.* at 2133 (internal quotations and citations omitted).

[33] Mass. Rev. Stat., ch. 134, § 16.

[34] *Bruen*, 142 S. Ct. at 2132 ("[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are central considerations when engaging in an analogical inquiry.") (internal quotations omitted).

[35] Mass. Rev. Stat., ch. 134, § 16.

[36] *Bruen*, 142 S. Ct. at 2148.

finding; an indictment by a grand jury need only show probable cause that an individual committed a crime, and the crime need not even relate to a firearm.[37] And the accused are entitled to neither notice of, nor an opportunity to be heard at, grand jury proceedings, so the accused never has a chance to contest their Second Amendment-rights-depriving status as an indictee.

As explained above, surety laws didn't exist until long after the Second Amendment's adoption, and even then, they weren't widespread enough to serve as a "historical tradition." Moreover, surety laws are fundamentally different from § 922(n) in substance, burden, and process. Bear in mind, the alleged societal problem addressed by § 922(n)—persons under indictment receiving firearms—has existed for the entirety of our Nation's existence. If restricting such persons from receiving firearms was part of our "historical tradition," *some* analogue would exist—and likely a close one. Instead, it appears that our Nation has long dealt with this alleged societal problem through the pre-trial detention process, where those deemed by a neutral magistrate to pose a threat to society are detained pending their trial, but only after an adversarial proceeding where the accused has an opportunity to appear and argue for their release. Recall, Stambaugh has twice been through such a process and has twice been deemed fit for release on bail pending trial.

---

[37] *See, e.g.*, *Woolverton v. Multi-Cnty. Grand Jury Oklahoma Cnty.*, 859 P.2d 1112, 1116 (Okla. Crim App. 1993). For example, counsel for Stambaugh pointed out at the hearing that, in Oklahoma, a person indicted for altering a postage stamp is subject to § 922(n)'s prohibition of receiving a firearm. *See* 21 O.S. §§ 63-1588, 1621.

*Conclusion*

A historical analogue to support constitutional applications of § 922(n) might well exist, but the United States hasn't pointed to it. And because it is the United States' burden to demonstrate that laws like § 922(n) are "part of the historical tradition that delimits the outer bounds of the right to keep and bear arms," that failure is fatal. While the United States needed not find a "historical twin," surety laws and § 922(n) are simply not "analogous enough to pass constitutional muster," particularly not in a case like this, where there is nothing in the record to support the United States' contention that Stambaugh is categorically a "dangerous person" merely because he was indicted for larceny. Accordingly, the Court finds that § 922(n) is unconstitutional as applied to Stambaugh and therefore **GRANTS** his motion to dismiss Count 3 of the Indictment.

**IT IS SO ORDERED** this 14th day of November 2022.

_____
PATRICK R. WYRICK
UNITED STATES DISTRICT JUDGE